UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRY R. STINEBACK,

          Petitioner,          Case No. 2:18-cv-11649
                                              Hon. Nancy G. Edmunds
v.

SHERMAN CAMPBELL,

          Respondent.
_____/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DENYING A CERTIFICATE OF APPEALABILITY, AND (3) DENYING PERMISSION TO APPEAL IN FORMA PAUPERIS**

Terry Stineback, ("Petitioner"), a Michigan prisoner, filed this action under 28 U.S.C. § 2254. Petitioner was convicted after a jury trial in the Cass Circuit Court of second degree murder, MICH. COMP. LAWS § 750.317, assault with intent to commit murder, MICH. COMP. LAWS § 750.383, and commission of a felony with a firearm. MICH. COMP. LAWS § 750.227b. Petitioner was sentenced to an effective controlling term of 22 to 42 years' imprisonment.

The petition raises six claims: (1) Petitioner's rights under the Confrontation Clause were violated when his minor daughter testified against him via closed-circuit television; (2) insufficient evidence was presented at trial to disprove Petitioner's self-defense claim; (3) insufficient evidence was presented to prove that Petitioner committed assault with intent to commit murder; and (4) the prosecutor committed misconduct by commenting on Petitioner's post-arrest silence. The Court will deny the petition because Petitioner's claims are without merit. The Court will also deny Petitioner a certificate of appealability and deny permission to appeal in forma pauperis.

1

## I. Background

Petitioner was originally charged with first-degree murder, assault with intent to commit murder, and commission of a felony with a firearm in connection with the shooting death of his wife.

Testimony admitted at trial indicated that Petitioner was fed-up his wife continually calling and texting him since she had been off work on medical leave. He expressed his exasperation to coworkers on the date of the shooting. On the night of the shooting, Petitioner drank at a bar after work and then returned home. Testimony from one of the bar patrons indicated that Petitioner was upset at the victim, and he showed him his cell phone which showed that she tried to call Petitioner over twenty times while he was at the bar.

Upon arriving home, Petitioner and the victim exchanged loud words in the kitchen. This prompted their nine-year-old daughter, JL, to come downstairs. JL testified via closed-circuit television that when she went into the kitchen she saw Petitioner on top of her mother choking her. After repeated attempts, she was finally able to push Petitioner off her mother. JL and her mother ran upstairs. JL guided her mother into the master bedroom where JL hoped she would call 9-1-1. Instead, Petitioner followed the victim inside the bedroom and locked the door behind him. JL then heard loud arguing for a few minutes as she paced back and forth in front of the bedroom door.

JL heard several loud bangs, and the house suddenly fell silent. She then heard Petitioner on the phone with 9-1-1. Petitioner admitted to the 9-1-1 operator that he shot the victim. Eventually, Petitioner emerged from the bedroom and told JL to go outside, where she was met be emergency responders.

The forensic evidence indicated that the victim had been shot three times. One shot, which entered her left arm pit and traveled diagonally through her body, was likely fired while the victim

had her left arm extended from a position lower than Petitioner. The other two gunshots entered the victims' back. The victim was found lying in a fetal position next to her bed. The angle of the shots to the back suggested that those two shots were also filed while she was positioned lower than Petitioner. No weapon was found near the victim. Petitioner's handgun, with which he admitted to shooting the victim, was found lying on the bed. Other firearms were found in the house.

Petitioner testified in his own defense that he shot the victim because he thought she was reaching for her handgun when they were arguing in the bedroom. Petitioner explained that because the room was only lit by a television it was difficult to see whether the victim was armed, but he thought she was. Petitioner testified that after he fired the first shot, he thought the victim continued to move towards him, so he fired twice more.

The jury rejected the defense and found Petitioner guilty of second-degree murder, assault with intent to commit murder (for the conduct in the kitchen), and felony-firearm. Following sentencing, Petitioner was appointed appellate counsel who filed a claim of appeal. Appellate counsel filed a brief on appeal raising four claims:

> I. Must Mr. Stineback's convictions be vacated because his rights under the Confrontation Clause were violated when a witness (not a complainant), who did not see the actual shooting, was allowed to testify outside the courtroom and outside the presence of Mr. Stineback, which also violated MCR 6.006?
>
> II. Can Mr. Stineback be guilty of second-degree murder when there is insufficient evidence to support such a conviction when Mr. Stineback was acting in lawful self-defense?
>
> III. Can Mr. Stineback be guilty of assault with intent to murder when there is insufficient evidence to support such a conviction?
>
> IV. Did prosecutorial misconduct deny Mr. Stineback a fair trial and shifted the burden as the prosecution commented on Mr. Stineback's "13 months of not talking or telling anybody what happened"?

The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished opinion. *People v. Stineback*, 2017 WL 5616125 (Mich. Ct. App. Nov. 21, 2017). Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims. The Michigan Supreme Court denied the application by standard form order. *People v. Stineback*, 910 N.W.2d 273 (Mich. 2018) (Table).

## II. Standard of Review

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003), quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) quoting *Williams*, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme

4

malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103 (internal quotation omitted).

### III. Analysis

A. Admission of Testimony by Closed-Circuit Television

Petitioner first claims that the admission of the testimony of his and the victim's nine-year-old daughter by way of closed-circuit television violated his Sixth Amendment right to face-to-face confrontation. The Michigan Court of Appeals summarized the facts surrounding the claim:

> Before trial, the prosecution moved for permission to allow JL, a nine-year-old girl whom Laura had raised since she was a baby, to testify outside the presence of defendant. It was alleged that her mental and emotional status were fragile from the severe trauma she suffered from experiencing the shooting death of her mother by her father. Defendant opposed the motion on the grounds that defendant would be unduly prejudiced and the procedure would violate his constitutional right to confront the witness testifying against him. The trial court held an evidentiary hearing on the motion.
>
> At the hearing, Dr. James Henry, an expert in social work and developmental psychology who had extensive experience dealing with children suffering from trauma, testified that JL was referred to him for an assessment by the Department of Human Services. He evaluated JL during July 2015, when she was still 9 years old. JL told Dr. Henry that her father killed her mother and was drunk when he did it. He determined that she was depressed and suffering from post-traumatic stress disorder. He explained that even though the traumatic experience was over, she mentally disassociated to protect herself from harm. Further, he testified that JL's current caregiver indicated that she had explosive aggressive episodes.
>
> Dr. Henry explained that although defendant and Laura were not JL's biological parents, she considered them her parents. He explained that he wrote a letter to JL's lawyer-guardian ad litem that gave his professional opinion that JL should not testify in the criminal proceedings against defendant because of potential

5

mental and emotional harm to her. He testified that JL faced further traumatization from testifying that could lead to hospitalization or long-term residency in a care facility because it would trigger her memories of the incident. He opined that JL would be overwhelmed if she had any visual contact with defendant and ran the significant risk of deterioration. She was not stable and testifying in defendant's presence would harm her. On cross-examination, Dr. Henry admitted that although he stated that JL was afraid of defendant, she actually had not openly expressed that she feared him. Nevertheless, in his opinion, to ensure her well-being, he believed that JL should not testify.

After hearing the parties' arguments, the trial court issued its opinion and ruling from the bench. The trial court observed that defendant had a constitutional right to confront the witnesses against him, but stated that it recognized that defendant's right was not absolute. The trial court reflected upon the principles articulated by the United States Supreme Court in *Maryland v. Craig*, 497 U.S. 836 (1990). The trial court considered whether allowing JL to testify via one-way, closed-circuit television would further an important public policy and still assure the reliability of the witness's testimony. The trial court noted that *Craig* clarified that the confrontation right required that the witness testify under oath, that the defendant have an opportunity to cross-examine the witness, and that the jury must be able to observe the witness's testimony. The trial court noted that it had broad discretion in controlling the mode and method of presentation of witnesses.

The trial court looked first at whether the prosecution's proposed procedure would further an important state interest and whether that procedure would protect the witness. The trial court found that protecting JL from further trauma in this case served an important state interest. The trial court relied upon Dr. Henry's testimony and professional opinion and found that if JL testified face-to-face against defendant at trial, she faced a significant risk of severe psychological harm. The trial court then considered whether defendant would suffer actual prejudice if she testified via one-way, closed-circuit television. The trial court held that the proposed process would not result in actual prejudice to the defendant. The trial court held that allowing JL to testify remotely via closed-circuit television minimized the risk of significant harm to her and ensured the reliability of her testimony. Therefore, the trial court granted the prosecution's motion. At trial, JL testified under oath via one-way closed-circuit television with all trial participants observing her, and defense counsel cross-examined her.

*Stineback*, 2017 WL 5616125, at *1-2.

Based on these facts, the Michigan Court of Appeals went on to examine Petitioner's claim that the trial court's ruling violated his right to face-to-face confrontation. The Court of Appeals

found that the trial court did not err in striking a balance as it did between the state's and Petitioner's interests in allowing JL to testify remotely:

> The Confrontation Clauses of the Michigan and federal constitutions provide that in all criminal prosecutions, the accused has the right to be confronted with the witnesses against him. U.S. Const., Am VI; Const. 1963, art 1, § 20. The right to confront and cross-examine witnesses is intended to seek the truth and promote the reliability of criminal trials. *People v. Nunley*, 491 Mich. 686, 697 (2012). "[T]he Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988). But the Court foresaw that exceptions to the face-to-face confrontation may be necessary to further an important public policy. *Id*. at 1021. Later, the Court held that "the face-to-face confrontation requirement is not absolute." *Craig*, 497 U.S. at 850.
>
> In *Craig*, the Supreme Court decided whether the Confrontation Clause categorically prohibited a child witness in a child abuse case from testifying against a defendant at trial via one-way, closed-circuit television. *Id*. at 840. The Court concluded that face-to-face confrontation was not required if two conditions were met: (1) the denial of such confrontation was "necessary to further an important public policy" or state interest, and (2) "the reliability of the testimony is otherwise assured." *Id*. at 850, 852. Generally, to ensure reliability the witness must (1) testify under oath, (2) submit to cross-examination, and (3) permit the jury deciding the defendant's fate to observe the witness's demeanor and assess her credibility. *Id*. at 845–846, 851.
>
> The Supreme Court held that the state's interest in "protecting the physical and emotional well-being of youth" was compelling and sufficed to meet the first prong of the test. *Id*. at 852–853. The Supreme Court stated that it was "confident that use of the one-way closed-circuit television procedure, where necessary to further an important state interest, does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause." *Id*. at 852. The Supreme Court instructed that the "requisite finding of necessity must of course be a case-specific one: The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify[,]" "find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant[,]" and "that the emotional distress suffered by the child witness in the presence of the defendant is more than deminimis, i.e., more than mere nervousness or excitement or some reluctance to testify." *Id*. at 855–856 (citations and quotation marks omitted).
>
> The Supreme Court stated:

In sum, we conclude that where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation. Because there is no dispute that the child witnesses in this case testified under oath, were subject to full cross-examination, and were able to be observed by the judge, jury, and defendant as they testified, we conclude that, to the extent that a proper finding of necessity has been made, the admission of such testimony would be consonant with the Confrontation Clause. [*Id*. at 857.]

We adopted the test articulated in Craig and have applied it in several cases. See *People v. Rose*, 289 Mich. App. 499, 515–516 (2010). In *Rose*, we held that the use of a one-way witness screen that prevented the child witness from seeing the defendant "preserved the other elements of the confrontation right and, therefore, adequately ensured the reliability of the truth-seeking process" and therefore, affirmed the trial court's decision to permit the child witness to testify under that procedure. *Id*. at 517, citing *Craig*, 497 U.S. at 851–852.

In this case, our review of the trial court record establishes that JL's physical and psychological well-being were vulnerable and in need of protection from the presence of defendant while testifying. At the evidentiary hearing on the prosecution's motion, Dr. Henry testified that she was extremely vulnerable and significantly likely to suffer further traumatization if she testified face-to-face in defendant's presence. He further testified that JL's emotional state remained particularly fragile, and in his professional opinion she faced suffering severe emotional distress resulting in hospitalization or long-term residency in a care facility if required to testify in defendant's presence.

Defendant proffered no rebuttal testimony to Dr. Henry's testimony and expert opinion. We believe that the evidence presented to the trial court, therefore, established unequivocally that JL required protection. The trial court's finding that JL was a vulnerable child witness requiring protection rested upon solid evidence; consequently, defendant has failed to establish any error in the trial court's fact-finding.

The trial court followed the strictures set forth in *Craig* and correctly held that because JL was a vulnerable child witness, a significant public policy and state interest would be served by protecting her through allowing her to testify via one-way, closed-circuit television. Under *Craig*, as a matter of law, protection of a vulnerable child witness like JL served a compelling state interest. Therefore, the

> trial court did not err in by holding that public policy and the state's interest would be served by protecting JL in the manner proposed by the prosecution.
>
> To ensure the reliability of JL's testimony as required by *Craig*, the trial required JL to (1) testify under oath, (2) submit to cross-examination, and (3) be observed during her testimony by the jurors so that they could determine her demeanor and assess her credibility. Therefore, the trial court correctly satisfied all of the requirements articulated in Craig to ensure the reliability of JL's testimony. Consequently, defendant's constitutional confrontation right was not violated. Accordingly, we affirm the trial court's ruling that allowed JL to testify at trial via one-way, closed-circuit television.

*Stineback*, 2017 WL 5616125, at *2-4.

This decision did not involve an unreasonable application of clearly established Supreme Court law, and therefore Petitioner has failed to demonstrate entitlement to habeas relief. In *Maryland v. Craig*, 497 U.S. 836 (1990), the Supreme Court upheld a Maryland closed-circuit television statute and held that the Confrontation Clause did not require a literal face-to-face confrontation in all instances. *Id*. at 849-850. The Court observed that the core purpose of the Confrontation Clause was to ensure rigorous adversarial testing of accusing witnesses, i.e., cross-examination, providing sworn testimony under penalty of perjury, and jurors' observance of the witnesses' demeanor. *Id*. at 845-846. The Court noted that although a face-to-face confrontation formed the core value behind the Confrontation Clause, it was a "preference" rather than an absolute requirement. *Id*. at 847, 850. The Court held that a denial of in person face-to-face confrontation may occur consistent with the Confrontation Clause where it is necessary to: 1) further an important public policy; and 2) the procedures provided in lieu of the face-to-face confrontation ensure the reliability of the testimony. *Id*. at 850.

The Maryland statute in question allowed a child abuse victim to testify via closed-circuit television if the trial court found that the child would suffer "serious emotional distress" such that the child could not "reasonably communicate." *Id*. at fn. 1. The Court held that Maryland had an

9

"important" public policy interest in the protection of minor victims of sex crimes from further trauma. *Id*. at 855. The Court further held that whether a denial of a face-to-face confrontation was necessary would have to be determined on a case-by-case basis. *Id*. at 857-858. The Court explicitly decided against specifically defining the "minimum showing of emotional trauma" necessary because the "serious emotional distress" standard, "clearly suffices to meet constitutional standards." *Id*. at 856. Additionally, the Court observed that where a face-to-face confrontation caused significant emotional distress in a child witness, "there is evidence that such confrontation would in fact disserve the Confrontation Clause's truth-seeking goal." *Id*. at 857.

The trial court did not violate the dictates of *Craig*, nor did the Michigan Court of Appeals unreasonably reject Petitioner's claim. The trial court held an evidentiary hearing on the issue, and after hearing expert witness testimony it found that JL was a vulnerable child witness, and it found that she was significantly likely to suffer severe emotional distress that might result in hospitalization if she was required to testify in Petitioner's presence. Petitioner offering nothing in the state courts and he offers nothing here to undermine these factual findings which are presumptively true on federal habeas review. See 28 U.S.C. § 2254(e). The state courts therefore reasonably found that a significant public policy and state interest was served by taking measures to avoid this harm by allowing JL to testify by closed-circuit television.

The state courts furthermore ensured that procedures were retained to ensure the reliability of JL's testimony. The witness was required to testify under oath, she was subject to cross-examination by defense counsel through the video system, and she could be observed by the jury on camera which enabled them to view her demeanor and assess her credibility. Therefore, the trial court complied with the requirements of *Craig*, and the adjudication of his claim in the

Michigan Court of Appeals did not result in an unreasonable application of clearly established Supreme Court law.

B. Sufficiency of the Evidence

Petitioner next asserts that insufficient evidence was presented at trial to disprove his self-defense claim and to prove that he committed assault with intent to commit murder for the incident in the kitchen prior to the murder. The Michigan Court of Appeals rejected both arguments on the merits. *Stineback*, 2017 WL 5616125, at *4-6.

With respect to the challenge to the evidence disproving self-defense, the claim is not cognizable on federal habeas review because Petitioner had no federal constitutional right to proof beyond a reasonable doubt that he did not kill the victim in self-defense. Under Michigan law, self-defense is an affirmative defense. See *People v. Dupree*, 788 N.W.2d 399, 405 (Mich. 2010). "An affirmative defense, like self-defense, 'admits the crime but seeks to excuse or justify its commission. It does not negate specific elements of the crime.'" *People v. Reese*, 815 N.W.2d 85, 101 n.76 (2012) (quoting *Dupree*, 788 N.W.2d at 405 n.11). Although a prosecutor is required to disprove a claim of self-defense under Michigan law, *People v. Watts*, 232 N.W.2d 396, 398 (Mich. Ct. App. 1975), "[p]roof of the nonexistence of . . . affirmative defenses has never been constitutionally required," *Smith v. United States*, 568 U.S. 106, 110 (2013) (quoting *Patterson v. New York*, 432 U.S. 197, 210 (1977)). Thus, as a matter of federal constitutional law, the Constitution did not require the prosecution in Petitioner's case to disprove self-defense beyond a reasonable doubt. See *Martin v. Ohio*, 480 U.S. 228, 233-36 (1987) (rejecting claim that putting burden on defendant to prove self-defense is unconstitutional); see also *Allen v. Redman*, 858 F.2d

1194, 1197 (6th Cir. 1988) (explaining that habeas review of sufficiency-of-the-evidence claims is limited to elements of the crimes as defined by state law).[1]

With respect to the sufficiency of the evidence for the assault with intent to commit murder conviction, the claim is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "'a nearly insurmountable hurdle'" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Here, JL testified that she saw Petitioner straddling her mother with his hands around her neck. The victim had been screaming, which alerted JL, but she could no longer do so while Petitioner's hands were around her throat. JL tried several times to move Petitioner off the victim before she finally succeeded. And of course Petitioner eventually shot the victim to death. Viewed most favorably to the prosecution, the evidence therefore proved beyond a reasonable doubt that

---

[1] In any event, given JL's eyewitness testimony and the fact that Petitioner shot the victim three times, including twice in the back, it was reasonable for the Michigan Court of Appeals to find that the prosecutor disproved self-defense beyond a reasonable doubt.

Petitioner possessed the intent to kill while he was attempting to strangle the victim in the kitchen. Giving the state court the considerable deference it is due under AEDPA, the adjudication of this claim in the state court did not involve an unreasonable application of *Jackson*. Petitioner's sufficiency of the evidence claims are without merit.

C. Reference to Petitioner's Post-Arrest Silence

Petitioner finally asserts that the prosecutor committed misconduct by referring to his post-arrest silence during closing argument by remarking that Petitioner remained silent about what occurred in the bedroom until his trial testimony. The Michigan Court of Appeals found that the remarks implicated Petitioner's Fifth Amendment right against self-incrimination, but that any error was harmless in light of the brevity of the remarks in comparison to the length of the argument and the strength of the case:

> Here, the strength of the prosecutor's overall case did not hinge entirely on their assessment of defendant's credibility. During its case-in-chief, the prosecutor presented compelling evidence without references to defendant's postarrest, post-Miranda silence to support defendant's convictions for the charged offenses. Defendant's coworkers and people with whom defendant spoke at the Eagles Club testified that defendant was irritated with Laura on the day and evening of the incident. JL testified about what she saw and heard in the house before and during the incident. Several investigating police officers testified about what they observed at the scene of the crime. Photographs of the scene were admitted into evidence. Dr. Cohle testified about the substantial forensic evidence that established that Laura was in a defensive posture each time she was shot. Accordingly, we hold that the prosecutor's nonextensive references to defendant's postarrest, post-*Miranda* silence, although improper, were not outcome determinative. Further, reversal is not warranted because a curative instruction could have alleviated the prejudicial effect if any resulted from the prosecutor's limited comments. *Unger*, 278 Mich. App. at 235.

*Stineback*, 2017 WL 5616125, at *7.

A constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); see also *Fry v. Pliler*, 551 U.S. 112, 117-18 (2007)

13

(confirming that *Brecht* standard applies in "virtually all" habeas cases). Harmless error analysis applies to claims such as the present one. See *Brecht*, 507 U.S. at 637 (state's improper use of defendant's post-*Miranda* silence to impeach defendant's claim of accident was harmless as it did not have a substantial or injurious effect or influence upon the jury's verdict); *Billingslea v. Jackson*, 83 F. App'x 33, 40 (6th Cir. 2003).

In this case, the testimony of JL when taken together with Petitioner's admissions, the evidence of the victim's injuries, and the fact no weapon was found near her body, convincingly established that Petitioner was guilty of the offenses for which he was convicted. The complained-of remark was a relatively brief part of a much lengthier closing argument that focused on the properly admitted evidence of Petitioner's guilt. Dkt. 8-10, at 155-177. Given the significant evidence of Petitioner's guilt and the lack of evidence showing that the shooting was done in self-defense, the Court's finds that the complained of remarks did not have a substantial impact on the outcome of the trial. Habeas relief is not warranted on this claim.

As none of Petitioner's claims merit relief, the petition will be denied.

### IV. Certificate of Appealability

Before Petitioner may appeal this decision, the Court must determine whether to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(1)(A); Fed. R.App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). The Court finds that reasonable jurists would not debate the

resolution of Petitioner's claims because they are devoid of merit. The Court will therefore deny a certificate of appealability. Finally, Petitioner is denied permission to proceed in forma pauperis because an appeal could not be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V. Conclusion

Accordingly, the Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, 2) **DENIES** a certificate of appealability, and 3) **DENIES** permission to appeal in forma pauperis.

**SO ORDERED.**

s/ Nancy G. Edmunds
Hon. Nancy G. Edmunds
United States District Judge

Dated: September 5, 2019